Next case and the last case on today's docket is the case of N. Ray D.L.H., Jr., a minor versus the people of the state of Illinois versus D.L.H., Jr., a minor. We have Mr. Bill Walker for the appellant, and we have Jennifer Camden for the appellee. You may begin, Mr. Walker. Thank you, Justice. Justice, counsel, my name is Bill T. Walker, and along with full counsel James Parrott, I represent the juvenile in this case. The ex-governor of California made a statement one time for the famous, I'll be back. I'm back on this case. You're back? I'm back on this one. Two out of the original are back. Well, if you remember, it was only two of you here to start with. Justice Wexton was not present at the time. I don't remember that. But it was a vacant seat here at that time. We have ten minutes to argue. It would take a total of ten people. I need 48 hours on the machine here to really cover all the issues that are still out there pending. But I think looking at what the Supreme Court, 7-0, set back, the first mistake I wanted to bring up, whether or not my client could form the intent to commit murder. And I would ask the court to, and I'll be redundant a little bit, but I'll try to keep it very brief. My client was nine years old at the time. I did not have my client evaluated. The state did. The state used Dr. Cuneo to evaluate him. Dr. Cuneo came back and said that my client tested out at 7-point-something years of age. Dr. Cuneo spent a lot of time with my client and went through in detail. He made comments, Dr. Cuneo did, that my client didn't know how many, or how much was in a dozen, how many. My client didn't know how many days in a week. Those, I think, are very basic here. My client didn't understand those. But if you look at the witness hearing where Dr. Cuneo testified, and specifically page 45, beginning on line 23, in part, where Dr. Cuneo testifies to my client, he does not have a good abstract thinking. And in part, his abstract thinking is very poor. And in part, you have to have at least some level of abstraction to understand what's going on. He didn't have it. Then, same proceeding, page 52, excuse me, page 51 over 52, starting on line 24. In part, I mean the finality of death hard to grasp at 7 years, 8 years old. We're talking about an individual whose function as a 7- to 8-year-old. The gravity of what happened, or the range of punishments, are beyond this ability at this time. And this is an evaluation after the events, after the occurrence. And this is from the state's own evaluator. The only one who was to evaluate the juvenile in this case. Yet the state wants you to believe my client had the ability to form the intent to commit murder. Now, the Supreme Court also wanted you to apply whether or not it was harmless for the two videos, specifically the second video. Fortunately or unfortunately, I've been in this case since about the second week, pro bono. But I was there for every significant thing that's happened in this case. There is a large TV in the courtroom. The lights are turned down. The judge sits there with the detective sitting to his right and views this video. Views both videos, which are very lengthy. And the state wants you to believe that once the bell is rung, the judge is seeing this go on. It's like watching two short films. That bell can be unrung. It can't be unrung. The next thing, when you look at these witnesses here and you say, well, there's other evidence here to support conviction throughout the confession. It was testified that the individual, the 11-year-old, quote, unquote, turned my client in. Bullied my client, beat my client, and burned her. Over a long period of time. The Department of Feminist Services in Missouri did a study when he lived there before he moved to Cahokia. They decided in their study, concluded, that my client was a scapegoat. Sort of reminding Mark Twain and Princeton Polk, my client was the living boy for this conglomeration of people. The state wants you to believe that Ms. Wilburn is a substitute grandmother to my client. My client's mother and grandmother died when he was three, 90 days apart. That is tragic in itself for my client. My client couldn't help me with anything. Dr. Curnewa testified to that. My client found this unbid, the court found him unbid to stand trial. In three and a half plus decades of trying a lot of criminal cases, a lot of civil cases, I've never had a situation where I have a client sitting there and I can't ask a question, can't help, can't assist on anything. He's just sitting there, like a bump on a wall. That's his ability. The state says, well, we got the Dr. Forsythe. Dr. Forsythe was presented as a forensic pathologist in the testimony. Dr. Forsythe, in the judge certified her as an expert on objectives, and I get to voir dire her, judge. And I voir dire her. And after going through a lengthy examination of her, concluded in her own testimony, when I asked her, I asked her two questions. I'm a redneck, I don't understand basic language. You majored from Kansas State in home ecology. What is home ecology? And she told me, I don't understand it, it's home economics. Then I asked her, I said, is a forensic pathologist, are you a forensic pathologist? And she told me the best way to describe her, she was a student of it. At the time she did the autopsy, she was in her first month of a fellowship at St. Louis University. At the time she testified, she was still a student in forensic pathology. It would be like me being a third year law student and a corporation hiring me to give legal opinions to. More than that, you can say whatever I'm saying, just push it aside. Let's look at her testimony. I had asked over and over for an autopsy and a death certificate. I felt that was necessary in order to represent my client. I want to see what the cause of death was. I was told repeatedly, no autopsy, no death certificate yet. The day of the discharge hearing, I repeatedly asked for it again. It still didn't exist. Under a questioning, I found out it did exist. The state did present questions from the autopsy and did present photos from the autopsy. The problem was they didn't give it to me because it wasn't signed. And I'm wondering, it's been nine months, why hasn't it been signed? Come to find out from the testimony of Dr. Forsythe, who did the autopsy, because she's a student. She's not allowed to sign the autopsy report. It has to be a supervisor that signs it. It's been on the supervisor's desk for nine months. She can't sign the death certificate either. And this is who is allegedly the forensic pathologist here, continuing to sign the autopsy report. And the state says, I waived it by going forward with the discharge hearing. And I agreed with the statute to continue the discharge hearing. When the court came to it, the state came to it. Only the defense can do it. That's just the way the statute is set up. But I'm supposed to forfeit my client's right to a speedy trial? And my strategy is, how in the world are you going to prove cause of death if you don't have any death certificate and don't have an autopsy report? And I was led to believe they weren't available. They were available to the state. They presented questions from the autopsy report. And they presented pictures, photos. Then we did an argument that the physical therapist saw the victim for about an hour ending at 2.20 in the afternoon. And at 2 a.m., 11 hours and 40 minutes later, assistance was called. Now, when I look at this and look at my client, my client testified that he had picked up the baby, was holding the baby, cradling the baby, and took the baby to bed with him. Is that somebody that's got the intent? Somebody that thinks that the kid is dead or murdered? Somebody taking him to sleep and with the baby to start with? I get the pathologist to stay. You notice I didn't say forensic pathologist. It's pathologist. But it could have been a shaken baby. It could have been an injury. It could have come from a shaking. The pathologist, as well as the detective, the detective said on page 171 of the record, he had no clue when this injury happened. The pathologist on 281 said she couldn't tell the date when it occurred. She couldn't pinpoint the hour. The pathologist could not do anything as far as when it occurred, how it occurred, when it happened, who did it. I've got a question. One of the arguments that you're facing is that, devoid of the second interview, the state's case is irrelevant because the state's case is made on other evidence because the second interview is cumulative to the other evidence. Could you address whether there is, in fact, a cumulative effect or not from the summary, the totality of the other evidence? Yes, sir. And our position is, no, it's not cumulative or deplective of anything else. But when you look at what the testimony is, the state wants you to believe that my client talking to DCFS and talking to a non-family member of the state characterized as a grandmother, a virtual grandmother, that the father wasn't present, the father didn't give consent to it, and my client, who is limited in his knowledge and education or the state-known doctor, is told by adults to lie, to go in and lie about things. He can't tell the difference between one way or the other that he's in or lying. When you look at what the pathologist testified to, I don't believe anything is there. I don't think he's qualified, and I've checked on the record several times about that. When she went to a Caribbean medical school, couldn't get to an American medical school. I think the testimony was she applied to a couple dozen and couldn't get in. When you look at any of the other evidence that's there, it doesn't support, there's no sufficiency of evidence to support a not-guilty verdict, which is what my client is bound by the judge. Okay. Thank you. Yes, sir. Thank you, Mr. Walker. You've had the opportunity to speak as well. May I please support? Helpful. Jennifer Camden on behalf of the people. The respondent said that the pathologist testified that the victim could have died of shaken baby syndrome. She testified that some of the injuries she detected could also have been caused by shaken baby syndrome, but she said that all of the injuries were consistent with blunt force trauma, closed head injury. Shaken baby syndrome would not result in the large social bruises, the bruises to the scalp that she detected during the autopsy. I also want to note that the respondent's reply at page three says that the injuries were less than a week old and that that's all we know and suggests that someone else could have injured the victim in the days prior to his being taken to the hospital, suggesting that this timeframe extend days prior to the date of onset of symptoms. However, the victim in this case was injured on August 22nd and he died five days later on August 26th after being taken to the hospital on the 23rd. So the injuries were days old by then, but the important point is that the diffuse axonal injuries, which were devastating and could not have been sustained, according to the pathologist, more than even hours prior to the onset of those symptoms. The respondent states that he was told by adults to lie. I'm not sure that I see that in the record. He says that he was told by, he says in the reply from page eight that he was told to lie to protect the adults prior to Norma's questioning. The respondent said that he heard Alicia, that's the mother of the victim, say that if no one says anything, then no one will go to jail. He didn't say that he was told to say any specific thing. Further, his statements to Joyce or Melissa, Alicia, or Dr. Penao can't have been caused by this. Also, the other child, the 11-year-old, stated that he was told by the respondent's father to not say that he saw the respondent strike the victim, but that the only other indication in the record that he was told to say anything indicates that the children may have been told not to say that they'd been left alone. Notably, the respondent did tell DCFS investigator Edna Norman that he had been left alone with the other children on the night of the incident, and he certainly never said that he was told to say that he injured the victim, told to assume the blame for that. Moving on to the issue of harmlessness, as Your Honor mentioned, the State is arguing that the second statement was cumulative of properly admitted evidence, and therefore the State's proven that its admission was harmless beyond a reasonable doubt. Now, we are just talking about the admission of the second statement to Detective Adams. The other theory that the State is arguing is that just focusing on the error itself, it did not contribute to the verdict. It did not contribute to the content of this second statement. During the vast majority of it, the respondent denied all involvement in the injuries to the victim, eventually saying that the 11-year-old child had struck the victim repeatedly in the face and hit him in the side, and then he said at the end that it was the other child, and then, quote, I had went in with him and hit him once, and then he demonstrated with the doll that he had hit the victim once in the side. So this statement was largely exculpatory. In fact, the respondent here today has cited parts of it when he mentioned that the respondent also said that he brought the baby in and put him on the bed. The source of that information is also from the second statement. Also, this admission and demonstration in the second statement was not particularly inculpatory given that the victim died of closed head injuries, and he had concerned a strike to the side. It's not as though this court is being asked to weigh the effect of an admission to actions that would have caused severe head trauma, and it was cumulative of admissible evidence of inculpatory statements to five other people, including trusted adults and a DCFS worker. In fact, this admission and declaration was much less inculpatory because there were three blows to the victim, one to the side and two to the victim's head or face. So this improper evidence was much less inculpatory because, well, and it was completely congruent. First off, the second statement again involves an admission and demonstration of one strike to the side. Norman also testified that the respondent admitted and demonstrated to her a strike to the side. So we're dealing with 100% congruity here with the small portion of the part of the second statement that is inculpatory at all, the rest of it being exculpatory. And further, again, Norman also testified that the respondent unprompted, unlike the second statement that was excluded or should have been excluded, unprompted demonstrated to her all three of these strikes including two to the head or face. Additionally, there was evidence that prior to this statement from or statement to Adams, the second statement, he told four other people that he struck the victim. And finally, the closing argument shows that the statement was used for cumulative reasons. The state mentioned it in the context of observing how the respondent's statements had changed, arguing that that was probative of consciousness of guilt. But even without the second statement, there was evidence that the respondent's statements had changed. So in conclusion, there's nothing about the content or the use of this second statement that was not completely cumulative multiple times over of the properly admitted evidence or the respondent's argument about intent. Dr. Cuneo reported, and this was on page six of his report, that the respondent, despite his intellectual limitation, knew that beating a 14-month-old child can cause serious injury. So that's on page six of his report. It's discussed at page 22 of the People's Brief. The respondent mentioned today an argument that he had been scapegoated and abused by the family or by the 11-year-old child in particular. I won't go into the details here unless the court asks me to, but the people addressed that claim on pages 17 and 18 of the People's Answer Brief, and I directed the court to those pages for a response to that. And with regard to the respondent's argument that Dr. Forsythe was a home ec major in undergrad, I was a journalism major. I mean, people major in different things. She had gone to medical school, graduated from it, and was a licensed medical doctor in the state of Missouri. So the respondent hasn't shown that the court abused its discretion in certifying her as an expert in forensic pathology, and it's down on my brief. Does it go to the weight of her testimony? She testified that she was a home ec major in undergraduate school. She testified that she went to medical school in Grenada. I know she's licensed in the state of Missouri, but to what extent that may... There's a difference between qualifying her as an expert and the weight the trial court should be giving to her testimony. Is that relevant in that respect? Right. Well, your Honor, a couple of things. First off, the respondent was free to agree to a continuance, which the state was ready to agree to, and to await the autopsy report and to retain his own expert. In fact, I think he mentioned that one of the hearings prior to the trial was a discharge hearing, that that was something that he was looking into or thinking of doing, and he decided against that course for tactical reasons, which are discussed in the people's answer brief as the record spells out. I mean, the rule for deciding whether the trial court abuses its discretion in certifying Dr. Forsett as an expert in the field of forensic... I'm not arguing about that. Let's take it for the sake of argument that she's an expert. The finding that she's an expert does not necessitate the amount of weight or dictate the amount of weight that the trial court is to give her testimony. That's really what I'm focusing on. Well, I certainly don't think that there's... There was no other contrary testimony. I mean, for instance, she testified that all of the injuries were consistent with... Go ahead. Okay. Consistent with blunt force trauma and the fact that some of the injuries may also have been consistent with shaken baby syndrome is a fact that the respondent did try to question her on at the discharge hearing and he did cross-examine her on, but he was also free to present an expert of his own and present contrary evidence and he chose not to do so there. I can't... I can't imagine what conclusion of hers could be meaningfully harmed or undercut by the provenance of her medical degree. Well, shouldn't your point be that if she's qualified and her testimony is uncontroverted then it stands? I mean, if it were controverted, I would think her credibility could be called into issue. Was it not her first autopsy? Am I correct about that? No, Your Honor. The respondent had argued that the autopsy on this victim was  her first or second of an infant, of a child, and however, that information was taken from her testimony about what she had done during the first several weeks of her fellowship, which is when the autopsy on this victim began, and it excluded the 200 or so autopsies that she had done prior to her As a student before her medical degree? I mean, she doesn't have a medical degree until she starts her fellowship, correct? No, Your Honor. She, after medical school, she did a four-year pathology residency. Okay. And so I am not certain whether the, whether those 200 pre-forensic pathology fellowship autopsies occurred during medical school or during that four-year pathology residency, but that's the evidence in the record. One other note is that it is my understanding from the record that the autopsy report did not sit for nine months awaiting a signature. Rather, it's my understanding that because of the extraordinary nature of the victim's injuries, that this required a series of specialized slides to be prepared and taken, and that that procedure took a number of months, and that's supported in the record. So that was part of the reason for the holdup, and during that time, of course, Dr. Forsythe continued to gain in experience. Any further questions? Thank you, Ms. Camden. Mr. Walker, do you have any final? Yes, ma'am. In my civil practice, I do mainly medical malpractice, about 35, 37 years. There is no expert doctor who's going to let me go and interview someone and come back and tell them what was said. I spend six figure money every year collecting medical records. The reason I needed the autopsy is so I could take it to the expert. The expert needs to see the autopsy. I can't go interview or take a deposition of Dr. Forsythe and then take it to the expert and ask the expert to base their opinion on that. With a reasonable degree of medical certainty, they want to see the autopsy report and the records from that and the photos from that. That's why I needed that. Next thing is, they come today and they say, well, my client didn't do two, he did three blows. Well, the record shows it was 20 according to Dr. Forsythe. 20. Now, the 11-year-old says he heard boom boom twice in the other room and the state says my client was still in the victim against the wall. However, when police arrived, and you have to picture this, the state says the answer is logical. It's all one term. I'm not leaving common sense outside that door. If I'm going against that wall on two different occasions, there's not going to be blood, no marks, no skin, no nothing at all against that? This is the story from the 11-year-old. It just doesn't happen. The emotional impact, the state hasn't shown at all how the emotional impact of the judge looking at that video, those videos, number two specifically, how that's taken out of his mind and had no effect on him on making a decision. He'd have to, couldn't he do brain surgery to have some way of ESP to get into his mind to see what clicked and what didn't click for him. I say that's not possible. Another thing, look at what the state did in closing argument. I'm sitting there in closing argument and they start arguing accountability in closing argument, which I'd never heard of in this case before that day. If you look at their closing argument on accountability and we all know accountability there has to be proof that someone else committed the murder and I was accessory to it, acted with it, enhanced it in some way. So the state themselves in closing, when they start throwing up accountability to me, I'd had no notice on it, I'd seen no pleadings on it, I'd seen nothing to that point in closing. So the state there themselves is saying we question if my client killed the kid because in order to have accountability my client would not be the one that was the perpetrator, it'd be somebody else, unknown to anybody, not proven or anything. And this is the state's position. In fact, if you look at the closing argument, this is the end of their closing argument. That right there alone shows me, the two assistant state attorneys that worked on this case had doubt that my client committed these crimes because there are in accountability. Somebody else did it, but my client assisted in or helped in or enhanced it in some way. It's not alternative to  state's position. In order to argue that, you've got to believe there's somebody else who's the perpetrator of it. That's the state's position on it. Another thing, we have a situation here the state says it's my client because they just said in the time frame. Well, we know from 1220 in the afternoon to 2 a.m. in the morning was the exposure time if in fact the victim was not hurt before the physical therapist was there. Well, if we look at that in the time frame, the testimony is and the record shows the 11-year-old supposedly after the second booboom calls his mother on her phone cell phone and the adults ignored that phone call. Ignored it. Knew who was there, knew who it was, but they ignored it. Whatever the reason, the 11-year-old allegedly calls again and this time the phone is answered and the 11-year-old repeats to the adults that there could be something wrong with the victim in this case. The adults supposedly do nothing and sit there for another 90 minutes talking to the other adults. Then after 90 minutes they go home. When they get home, does anybody check on the victim? None. Nobody checks on the victim. In fact, the victim's mother leaves again. And when she leaves, she has to be called and ends up another person that's living in that household takes the kid, calls the service and has him picked up. We believe strongly, very strongly, that this case should be totally dismissed or an alternative remanded back to the court in St. Clair County. I've been given a chance to look at it, and I can prove that shaken baby syndrome in this kid from Cahokia, black, very limited education, is a stroke down with another fault. Thank you, Your Honor. Thank you, Mr. Walker. I would like to reiterate for the record that the state's motion to strike the new argument for lack of jurisdiction has been taken with the case and will be decided when the case is decided. Thank you for your arguments and briefs, and we'll take the matter under advisement. The court is in recess until tomorrow morning at 9 o'clock.